STATE OF NORTH CAROLINA v. JONATHAN EARL LEEPER

No. 256A00

(Filed 28 June 2002)

## 1. Evidence— character—reference to previous experience with Miranda warnings—not prejudicial

There was no prejudice in a first-degree murder and armed robbery prosecution from a reference in an officer's testimony to defendant's previous experience with Miranda warnings because defendant acknowledged shooting both victims.

## 2. Homicide— short-form indictments—firearms enhancement holding

The firearms enhancement holding in *State v. Lucas*, 353 N.C. 568, does not conflict with the North Carolina Supreme Court's holdings on short-form murder indictments.

## 3. Sentencing— capital—use of juvenile adjudications—effective date

A 1992 juvenile adjudication could be used as an aggravating circumstance for first-degree murder even though defendant contended that the amendments concerning confidentiality of juvenile records and allowing the use of juvenile adjudications pertained only to offenses committed on or after 1 May 1994. The effective date of the amendments pertain to sentencing for crimes committed on or after that date, not to the date of the prior adjudications. N.C.G.S. § 15A-2000(e)(3).

## 4. Sentencing— capital—evidence—circumstances of prior conviction

There was no error in the sentencing phase of a capital prosecution for first-degree murder in the introduction of evidence that defendant had obtained a gun used in a prior robbery from a purse stolen two days before the prior robbery. Although defendant contended that this evidence was beyond the scope of N.C.G.S. § 7B-3000(f), the State in a capital sentencing proceeding is entitled to prove the circumstances of prior convictions and is not limited to the record of the conviction.

**5. Sentencing— capital—aggravating circumstances—instruc-
tions—course of conduct**

The trial court did not err in a capital sentencing proceeding
for a 1996 murder in its instruction on the course of conduct
aggravating circumstance where defendant contended that the
instruction permitted the jury to consider a 1992 juvenile adjudi-
cation and a 1992 purse snatching. One may not reasonably infer
that a juror would stretch "on or about" to encompass a span of
over four years. Moreover, the court instructed the jurors that the
juvenile acts introduced to support the prior violent felony cir-
cumstance could not be used as the basis for the course of con-
duct circumstance.

**6. Constitutional Law— ex post facto prohibition—use of
juvenile adjudication in capital sentencing**

The use of juvenile adjudications as an aggravating circum-
stance does not violate ex post facto prohibitions.

**7. Sentencing— capital—death sentences not disproportionate**

Sentences of death imposed upon defendant for two first-
degree murders were not disproportionate where defendant was
convicted on the basis of premeditation and deliberation and
under the felony murder rule; the jury found as aggravating cir-
cumstances that defendant had previously been adjudicated
delinquent in a juvenile proceeding for an offense that would
have been a felony involving violence to the person had de-
fendant been an adult, N.C.G.S. § 15A-2000(e)(5), and that
the murders were part of a violent course of conduct, N.C.G.S.
§ 15A-2000(e)(11); either of the statutory aggravating circum-
stances, standing alone, have been held sufficient to support a
sentence of death; defendant planned to rob the first victim, shot
the victim as he was driving his vehicle and immediately fled the
scene; only a short time later, defendant targeted the second vic-
tim, shot him and robbed him of a large amount of cash; and
defendant offered no help to the victims.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments
imposing sentences of death entered by Caldwell, J., on 22 February
2000 in Superior Court, Mecklenburg County, upon jury verdicts find-
ing defendant guilty of two counts of first-degree murder. On 30 May
2001, the Supreme Court allowed defendant's motion to bypass the
Court of Appeals as to his appeal of additional judgments. Heard in
the Supreme Court 11 February 2002.

*Roy Cooper, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, for defendant-appellant.*

BUTTERFIELD, Justice.

On 30 March 1998, defendant was indicted for the first-degree murders of Travis James Flowe and Clayton Eugene Foster, robbery with a dangerous weapon, and attempted robbery with a dangerous weapon. On 25 April 1998, defendant was also indicted for conspiracy to commit robbery with a dangerous weapon. Defendant was tried capitally before a jury at the 19 January 2000 session of Superior Court, Mecklenburg County. The jury found defendant guilty of both murders on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of conspiracy to commit robbery with a dangerous weapon, robbery with a dangerous weapon, and attempted robbery with a dangerous weapon. Following a capital sentencing proceeding, the jury recommended a sentence of death for each of the first-degree murder convictions. On 22 February 2000, the trial court sentenced defendant accordingly. The trial court also sentenced defendant to terms of imprisonment to be served concurrent with the sentences of death but consecutive to each other as follows: 77 to 102 months' imprisonment for the robbery with a dangerous weapon conviction, 77 to 102 months' imprisonment for the attempted robbery with a dangerous weapon conviction, and 29 to 44 months' imprisonment for the conspiracy to commit robbery with a dangerous weapon conviction. Defendant appealed his sentence of death to this Court as of right. On 30 May 2001, this Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of the noncapital convictions and judgments.

At trial, the State's evidence tended to show that in the early morning hours of 18 April 1996, defendant was driving around Charlotte, North Carolina, with two men, defendant's cousin Laquette Kelly and a man Lamont (last name unknown), and two women, Shakena Billings and Krashana Davis. Billings drove the group to a Bi-Lo grocery on Freedom Drive. The group had previously discussed robbing someone. Defendant went over to a taxi and asked the driver, Travis Flowe, for a ride. Defendant was armed with a .380-caliber Lorcin pistol. As agreed upon earlier, the other individuals followed the cab in which defendant was traveling. Defendant pointed the pis-

tol at Flowe and told him to "[g]ive up the goods." Defendant stated that Flowe "flinched" or "jumped." Defendant fired his pistol at Flowe multiple times and jumped out of the taxi while the taxi was still moving. The taxi crashed into a tree. Defendant joined the others in the other vehicle. He did not take anything from Flowe. Flowe died as a result of gunshot wounds to his lung and aorta.

As the group drove back to the Springfield neighborhood, where defendant then lived, they spotted a known drug dealer, Clayton Foster, at a car wash pay phone. Billings stated, "That's a lick [robbery]." Defendant told Billings to turn around and return to the car wash. Billings parked the car at a bank across the street. Defendant left the car and walked up to Foster, gesturing that he wanted to buy some marijuana from Foster. Foster shook his head, indicating he had none to sell or did not want to sell defendant marijuana. Defendant turned and shouted Foster's name. Foster began to run. Defendant fired his pistol at Foster several times. Foster died of multiple gunshot wounds.

Defendant drove Foster's vehicle across the street to the bank. Kelly joined defendant in Foster's vehicle, and the others followed them to Clanton Park. Defendant removed a pistol and rifle from Foster's vehicle and put them in the other vehicle. Defendant also took Foster's jacket. The group then returned to the area of the car wash. Defendant found Foster lying on his stomach in one of the car wash bays. Defendant removed Foster's wallet from his back right pocket and found a large sum of cash. The wallet, which defendant took with him, was later determined to contain ten thousand dollars. Defendant gave the two females three to four hundred dollars each and told them not to tell anyone about the shootings and robbery. Defendant hid the rifle and sold the pistols.

More than a year later, in May 1997, Charlotte-Mecklenburg law enforcement officers received information about the shootings. In December 1997, law enforcement officers spoke with the two females involved. On 16 March 1998, defendant confessed to both murders while being interviewed by law enforcement officers.

## GUILT-INNOCENCE

[1] In his first assignment of error, defendant contends that the trial court erred in overruling his objection to a portion of a law enforcement officer's testimony in which the officer referred to defendant's previous experience with *Miranda* warnings. The record reveals

the following colloquy between Charlotte-Mecklenburg Police Department Investigator R.G. Buening and the prosecutor:

Q. At that point did you start to basically talk to him about what you had him there for at the police department?

A. That's correct.

Q. Explain to us how you started that procedure with him.

A. I informed Mr. Leeper that myself and Investigator Jackson wanted to talk to him about some crimes that had occurred in Charlotte that we believed he was involved in.

Q. And—go ahead; I'm sorry.

A. And at that point I advised Mr. Leeper that I needed to advise him of his Miranda Rights, at which time I began advising Mr. Leeper of his Miranda Rights according to the U.S. Constitution. And I asked Mr. Leeper if he had ever been advised of his Miranda Rights in the past.

Q. And what if any response did you get?

A. In response to that question Mr. Leeper indicated that he estimated that he had been advised of his rights—

Ms. ATKINS: Objection.

THE COURT: Overruled.

Q. Go ahead.

A. Mr. Leeper in response, again, indicated that he estimated that he had been advised of his rights six times prior to this date.

Q. Did you have any form at the time that the police department used to advise a suspect of their rights?

A. Yes, ma'am. There's a standard Miranda, a waiver of rights form that the Charlotte-Mecklenburg Police Department uses.

Very similar testimony had been given earlier during *voir dire* when the prosecutor was establishing the voluntariness of the confession for purposes of admissibility. Defendant argues that the testimony given by Investigator Buening regarding defendant having previously been given *Miranda* warnings was an attempt by the prosecutor to introduce evidence of defendant's character. The State argues that the evidence was offered for the purpose of proving the credibility of the

confession. Defendant contends that this evidence amounted to prejudicial error for which he is entitled to a new trial.

"The ultimate test of the admissibility of a confession is whether the statement was in fact voluntarily and understandingly made." *State v. Davis*, 305 N.C. 400, 419, 290 S.E.2d 574, 586 (1982), *quoted in State v. Fernandez*, 346 N.C. 1, 10, 484 S.E.2d 350, 356 (1997). This Court has established that "[t]he State has the burden of showing by a preponderance of the evidence that the defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary." *State v. Thibodeaux*, 341 N.C. 53, 58, 459 S.E.2d 501, 505 (1995). Whether the confession was voluntarily made is a question of law, and the trial judge is not required to submit the issue of voluntariness to the jury. *State v. Barnett*, 307 N.C. 608, 622-23, 300 S.E.2d 340, 347-48 (1983).

In *State v. Walker*, 266 N.C. 269, 145 S.E.2d 833 (1966), this Court stated, "If admitted in evidence, it is for the jury to determine whether the statements referred to in the testimony of the witness were in fact made by the defendant and the weight, if any, to be given such statements if made." *Id.* at 273, 145 S.E.2d at 836. The United States Supreme Court has stated that "the circumstances surrounding the taking of a confession can be highly relevant to two separate inquires, one legal and one factual. *Crane v. Kentucky*, 476 U.S. 683, 688, 90 L. Ed. 2d 636, 644 (1986). In addition to the legal issue of voluntariness to be decided by a trial judge, the Supreme Court has stated that "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Id.* at 689, 90 L. Ed. 2d at 644. Therefore, the factual issue of credibility for a jury's consideration stands apart from the issue of voluntariness that is decided as a question of law by a trial judge.

We note that defendant acknowledged shooting both victims and did so consistent with this Court's requirements under *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). Assuming *arguendo* that defendant is correct in his contentions and that the prosecutor's question was not relevant, any error was harmless error beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2001). Therefore, we overrule this assignment of error.

[2] In another assignment of error, defendant raises the short-form indictment issue and acknowledges that this Court has previously

held contrary to his position on this issue. Defendant suggests that *State v. Lucas*, 353 N.C. 568, 548 S.E.2d 712 (2001), may conflict with our prior holdings on this issue. We do not believe that the portion of the *Lucas* holding addressing sentencing pursuant to a firearm enhancement statute, upon which defendant relies, is pertinent to a first-degree murder case that is tried capitally. Therefore, we find no compelling reason to depart from our prior holdings and overrule this assignment of error.

## SENTENCING

By another assignment of error, defendant contends that the trial court erred by: (1) allowing the State to introduce a large amount of evidence about defendant's juvenile criminal activity in 1992; (2) by submitting the aggravating circumstance contained in N.C.G.S. § 15A-2000(e)(3) based on defendant's juvenile adjudication for armed robbery in 1992; and (3) by giving instructions on N.C.G.S. § 15A-2000(e)(11), which permitted the jury to base its finding of the course of conduct aggravation circumstance on defendant's 1992 juvenile adjudication. We disagree.

[3] Defendant argues that the 1992 juvenile adjudication for armed robbery could not be used to submit the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance because the 1994 amendment to N.C.G.S. § 15A-2000(e)(3) pertains only to "offenses" committed on or after 1 May 1994. Defendant's reading of the amending Act's effective date provision is incorrect. N.C.G.S. § 15A-2000(e)(3) provides as follows:

> The defendant had been previously convicted of a felony involving the use or threat of violence to the person or had been previously adjudicated delinquent in a juvenile proceeding for committing an offense that would be a Class A, B1, B2, C, D, or E felony involving the use or threat of violence to the person if the offense had been committed by an adult.

N.C.G.S. § 15A-2000(e)(3) (2001). Section 7 of the amending Act reads as follows:

> Section 6 of this act becomes effective on the date that G.S. 15A-1340.16 becomes effective and applies to offenses committed on or after that date. The remainder of this act becomes effective May 1, 1994. Sections 1, 2, 4, and 5 of this act apply to offenses committed on or after that date. Section 3 of this act applies to trials begun on or after that date.

Act of Mar. 8, 1994, ch. 7, sec. 7, 1993 N.C. Sess. Laws (Extra Sess. 1994) 10, 14. Defendant contends that the term "offenses" is ambiguous and could refer to the offense for which a defendant is being sentenced, the prior offense to be used as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(3), or both the murder and the prior offense.

Defendant's arguments concerning ambiguity and statutory construction are unpersuasive. There is no ambiguity in section 7 of the Act. Section 7 sets the effective date for the various sections within the Act. Section 5, which amended N.C.G.S. § 15A-2000(e)(3), became effective on 1 May 1994 and applied to all capital offenses committed on or after that date. Defendant questions the legislature's use of the word "offenses" rather than a more specific word such as "murder." In addition to amending N.C.G.S. § 15A-2000(e)(3), the Act amended statutes dealing with the sentencing of other crimes. By using the word "offenses," the legislature referred to all crimes subject to sentencing under the Act. The effective date pertains to the use of the prior adjudications in sentencing for crimes committed on or after 1 May 1994 and not to the date of the prior adjudications themselves.

Defendant also contends, in this same assignment of error, that the trial court erred in allowing evidence surrounding defendant's 1992 juvenile adjudication for armed robbery. Defendant argues that the same ambiguity applies to the confidentiality of juvenile records. The predecessor to N.C.G.S. § 7B-3000, which deals with the confidentiality of juvenile records, was N.C.G.S. § 7A-675. In the same act that amended N.C.G.S. § 15A-2000(e)(3), the legislature amended N.C.G.S. § 7A-675 to allow juvenile records to be examined and used in subsequent criminal proceedings. Applying the same analysis as used above, the use of juvenile records pertains to the use of the prior adjudications in sentencing for crimes committed on or after 1 May 1994 and not to the date of the prior adjudications themselves.

[4] In this same assignment of error, defendant contends that evidence, indicating that defendant had obtained the gun he used in the 1992 armed robbery by taking it from a purse he stole two days prior to the robbery was beyond the scope of N.C.G.S. § 7B-3000(f). Defendant has cited no authority for this argument other than to contend that introducing the evidence violated N.C.G.S. § 7B-3000(f) and was highly prejudicial. This Court has held that "the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction

of evidence of the record of conviction." *State v. Roper*, 328 N.C. 337, 365, 402 S.E.2d 600, 616, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991). We find defendant's argument unpersuasive.

**[5]** Defendant, in this same assignment of error, contends that the trial court erred in instructing the jury on the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance. Defendant argues that the instruction permitted the jury to consider defendant's 1992 juvenile adjudication and defendant's 1992 purse snatching as evidence to support this course of conduct aggravating circumstance. We do not agree. The trial court gave virtually the identical instruction regarding the course of conduct aggravating circumstance as to each murder:

> Now, Members of the Jury, a murder is a part of such course of conduct if you find from the evidence beyond a reasonable doubt that in addition to killing the victim, in this case the victim Clayton Eugene Foster, the defendant on or about the alleged date was engaged in a course of conduct which involved the commission of another crime of violence against another person, and that this or these other crimes were included in the same course of conduct in which the killing of the victim Clayton Eugene Foster was also a part, you would find this aggravating circumstance, and would so indicate by having your foreperson write, Yes, in the space after this aggravating circumstance on the Issues and Recommendation form.

One may not reasonably infer that a juror would stretch the phrase "on or about" to encompass a span of over four years in order to find this aggravator.

Additionally, after setting out the aggravators as to each case, the trial court instructed the jurors that they could not use the same evidence as a basis for finding more than one aggravating circumstance. This instruction clarified that the juvenile acts introduced in support of the (e)(3) aggravating circumstance could not be used as a basis for finding the (e)(11) aggravating circumstance. There is no merit in defendant's argument.

**[6]** Defendant also contends that the use of juvenile adjudications as an aggravating circumstance violates the *ex post facto* prohibitions of the United States and North Carolina Constitutions. For the reasons set forth in *State v. Wiley*, 355 N.C. 592, 624-27, 565 S.E.2d 22, 44-46 (2002), we find these arguments to be without merit. The trial court

properly admitted defendant's juvenile adjudication records and related evidence in support of the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance, properly submitted the circumstance to the jury, and properly instructed the jury on N.C.G.S. § 15A-2000(e)(11). This entire assignment of error is overruled.

## PRESERVATION

Defendant raises six additional issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving these issues for possible further judicial review: (1) the trial court erred by denying defendant's motion to permit *voir dire* of prospective jurors regarding parole eligibility; (2) the trial court's instructions defining the burden of proof applicable to mitigating circumstances violated defendant's constitutional rights because they used the vague term "satisfies"; (3) the trial court committed reversible error in its instructions that permitted jurors to reject a submitted mitigating circumstance because it had no mitigating value; (4) the trial court committed reversible error in its instructions as to the mitigating value of statutory and nonstatutory mitigating circumstances; (5) the trial court erred in instructing that each juror "may," rather than "must," consider any mitigating circumstances the juror determined to exist when deciding sentencing Issues Three and Four; and (6) the North Carolina death penalty statute is unconstitutional. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject these assignments of error.

## PROPORTIONALITY REVIEW

[7] Finally, this Court has the exclusive statutory duty in capital cases to review the record to determine (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). Having thoroughly reviewed the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. We find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Thus, we turn to our final statutory duty of proportionality review.

In the present case, the jury found defendant guilty of two counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. At defendant's capital sentencing proceeding, the jury found the existence of the three aggravating circumstances submitted for its consideration as to each murder: that defendant had been previously adjudicated delinquent in a juvenile proceeding for an offense that would have been a felony involving the use of or threat of violence to the person had defendant been an adult, N.C.G.S. § 15A-2000(e)(3); that the murders were committed while defendant was engaged in the commission of attempted robbery with a firearm (as to victim Flowe) or robbery with a firearm (as to victim Foster), N.C.G.S. § 15A-2000(e)(5); and that the murders were part of a violent course of conduct, N.C.G.S. § 15A-2000(e)(11).

Three statutory mitigating circumstances, including the catchall, were submitted as to each murder for the jury's consideration: defendant's capacity to appreciate the criminality of the conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); defendant's age at the time of the murder, N.C.G.S. § 15A-2000(f)(7); and the catchall, N.C.G.S. § 15A-2000(f)(9). Of these, the jury found the existence of only the (f)(9) mitigator for each murder. Of the thirty-two identical nonstatutory mitigating circumstances submitted by the trial court for consideration in each murder, one or more jurors found twenty-nine to exist and have mitigating value.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). "In our proportionality review, we must compare the present case with other cases in which this Court has ruled upon the proportionality issue." *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have determined the death penalty to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139

L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

Several characteristics of this case support this conclusion. Defendant was convicted of two counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. We have recognized that "a finding of premeditation and deliberation indicates 'a more calculated and cold-blooded crime.' " *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). In none of the cases held disproportionate by this Court did the jury find the existence of the (e)(3) aggravating circumstance, as the jury did here. The (e)(5) aggravating circumstance found by the jury here was also found in *Young*. However, in only two cases has this Court held a death sentence disproportionate despite the existence of multiple aggravating circumstances. In *Young*, this Court considered *inter alia* that the defendant had two accomplices, one of whom "finished" the crime. *Young*, 312 N.C. at 688, 325 S.E.2d at 193. By contrast, defendant in the present case had several accomplices who helped defendant only by driving him from location to location and handling the property stolen from one of the victims.

The (e)(11) aggravating circumstance found here by the jury was also found in *Bondurant* and *Rogers*. In *Bondurant*, this Court weighed the fact that the defendant expressed concern for the victim's life and remorse for his action by accompanying the victim to the hospital. *Bondurant*, 309 N.C. at 694, 309 S.E.2d at 182-83. In the present case, defendant shot both victims and immediately fled the scenes. Defendant did return to victim Foster, but only to rob him of the approximate ten thousand dollars in cash Foster was carrying. After the killings, defendant went to a drug house and slept. In *Rogers*, this Court held that it was not error for the trial court to submit the (e)(11) aggravating circumstances where after the defendant killed one person, he fired at another person with the intent to kill that person. *Rogers*, 316 N.C. at 234, 341 S.E.2d at 731. Although *Rogers* was found disproportionate, in that case only the (e)(11)

aggravating circumstance was submitted. *Id.* at 236, 341 S.E.2d at 732. Here, the (e)(3), (e)(5), and (e)(11) aggravating circumstances were submitted to and found by the jury.

We also consider cases in which this Court has held the death penalty proportionate; however, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We conclude that this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

This Court has "consistently held the death penalty proportionate in cases in which the defendant was convicted of killing more than one person." *State v. McNeill*, 349 N.C. 634, 655, 509 S.E.2d 415, 428 (1998), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999). Further, there are four statutory aggravating circumstances that, standing alone, this Court has held sufficient to support a sentence of death; the (e)(3), (e)(5), and (e)(11) statutory circumstances, which the jury found here, are among those four. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

In the present case, defendant planned to rob victim Flowe, shot the victim as he was driving his vehicle, and then immediately fled the scene. Only a short while later, defendant targeted victim Foster, shot him, and robbed him of a large amount of cash. Defendant offered no help to the victims. The crimes of which defendant was convicted and the circumstances under which they occurred manifest an egregious disregard for human life. Accordingly, we conclude that the sentences of death recommended by the jury for the murders and ordered by the trial court are not disproportionate.

We conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. Accordingly, the sentences of death recommended by the jury for the murders are left undisturbed.

NO ERROR.