STATE OF NORTH CAROLINA v. DANIEL THOMAS GARNER

No. 342A93-2

(Filed 28 July 1995)

## 1. Constitutional Law § 372 (NCI4th)— capital trial—no arbitrary prosecutorial discretion—death penalty not unconstitutional

The trial court properly denied defendant's motion to exclude the death penalty from consideration in his first-degree murder trial on the ground that the district attorney selected cases for capital prosecution in Robeson County in an arbitrary manner in violation of defendant's constitutional rights since the only limitation on the prosecutor's discretion pertinent to this case is that the decision to prosecute capitally may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including prosecution due to defendant's decision to exercise his constitutional rights; defendant did not show that the district attorney had an improper motive in deciding what charges to proceed with or which first-degree murder cases to try capitally; and a showing that one first-degree murder case was tried noncapitally in the county notwithstanding the existence of aggravating circumstances because of a mistake on the part of the assistant district attorney who prosecuted the case did not render the prosecutorial system for capital cases invalid as a whole. U.S. Const. amends. VII and XIV; N.C. Const. art. I, §§ 19, 23 and 27.

**Am Jur 2d, Criminal Law §§ 627, 628; Prosecuting Attorneys § 24.**

## 2. Jury § 222 (NCI4th)— jury selection—opposition to death penalty—excusal for cause—adequacy of questioning by court

The trial court adequately questioned prospective jurors to determine whether they could follow the law despite their personal opposition to the death penalty prior to excusing them for cause where the court, upon learning that a prospective juror had reservations about the death penalty, asked the juror whether there were any circumstances in which he or she could vote in favor of the death penalty, and each juror said "No."

**Am Jur 2d, Jury §§ 199, 279.**

STATE v. GARNER

[340 N.C. 573 (1995)]

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

**3. Jury § 232 (NCI4th)— death-qualification of jury—prejudice from racial composition not shown**

There was no merit to defendant's contention that he was prejudiced because death-qualification of the jury resulted in a racially imbalanced jury where defendant cited no case for his proposition that a jury which is racially disparate after death-qualification results in prejudice to defendant, and defendant failed to show that the jury in his case was racially disparate or that the jury composition prejudiced him.

**Am Jur 2d, Jury § 262.**

**4. Jury § 141 (NCI4th)— jury selection—exclusion of question about parole**

The trial court properly refused to permit defense counsel to ask a prospective juror in a capital trial a question concerning the length of time defendant would serve in prison if convicted and sentenced to life imprisonment. Furthermore, where the court then instructed that "life means life," it will be assumed that the jury followed the court's instruction and did not consider the possibility of parole in reaching its verdict.

**Am Jur 2d, Jury § 205.**

**5. Searches and Seizures § 69 (NCI4th)— search of defendant's jacket—residence of third party—consent by third party**

The trial court properly concluded that a search of defendant's jacket in a third party's residence was conducted with a valid consent, that defendant had no reasonable expectation of privacy, and that a pistol and car keys seized from the jacket were admissible in evidence where the third party consented to a search of her residence and signed the consent to search form; defendant's jacket was lying in a pile of clothing on the living room floor of the residence; and the officer who conducted the search did not know the jacket belonged to defendant when he discovered it there.

**Am Jur 2d, Searches and Seizures §§ 92 et seq.**

Authority to consent for another to search or seizure. 31 ALR2d 1078.

Comment Note.—Nature of interest in, or connection with, premises searched as affecting standing to attack legality of search. 78 ALR2d 246.

Admissibility of evidence discovered in warrantless search of property or premises authorized by one having ownership interest in property or premises other than relative. 49 ALR Fed. 511.

6. **Criminal Law § 454 (NCI4th)— capital sentencing—prosecutor's argument—prior life sentence—death penalty only additional punishment—error cured by court's actions**

The trial court did not err by failing to grant a mistrial when the prosecutor argued to the jury in a capital sentencing proceeding that defendant had already received a life sentence for another murder and the only way to give defendant additional punishment for the two murders at issue was to give him the death penalty where the court promptly sustained defendant's objection and allowed his motion to strike; the court then instructed the jury to "disregard that comment" of the prosecutor; and the court's actions therefore cured any possible error created by the prosecutor's argument.

**Am Jur 2d, Jury § 290; Trial §§ 708, 711.**

7. **Criminal Law § 1347 (NCI4th)— capital sentencing— course of conduct aggravating circumstance—instructions—consideration of prior and subsequent crimes**

Defendant's commission of a prior convenience store robbery and murder of the store clerk and his subsequent shooting of a taxicab driver were sufficiently connected to two murders by defendant at a motel to support the trial court's instruction permitting the jury to find the "course of conduct" aggravating circumstance for the two motel murders based on the convenience store and taxicab crimes where defendant committed the convenience store robbery and murder only four days before the double motel murders; defendant shot the taxicab driver less than three weeks after the motel murders; there was a span of only twenty-two days from the convenience store crimes to the shooting of the taxicab driver; the *modus operandi* for each crime was similar in that defendant used the same pistol to kill, or attempt

to kill, each victim and had one or two accomplices with him during each crime; and numerous witnesses testified that these acts were robberies for the purpose of obtaining money to buy drugs. Therefore, the trial court did not err by failing to give defendant's requested instruction which would have permitted the jury to find the course of conduct aggravating circumstance based only on the two motel murders.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penlty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

8. **Criminal Law § 454 (NCI4th)— capital sentencing—prosecutor's closing argument—jurors in position of victims—no due process violation—no gross impropriety**

The prosecutor's closing arguments in a capital sentencing hearing wherein he repeatedly asked the jurors to place themselves in the position of the murder victims did not prejudice defendant and thus did not deny him due process where the arguments did not manipulate or misstate the evidence and did not implicate specific constitutional rights of defendant, such as the right to counsel or the right to remain silent; the trial court also instructed the jurors that the arguments of counsel were not evidence and that their decision was to be made on the basis of the evidence alone; and the weight of the evidence was overwhelming as to the pecuniary gain and course of conduct aggravating circumstances. Furthermore, those arguments were not so grossly improper as to require the trial court to intervene in the absence of an objection by defendant.

**Am Jur 2d, Trial §§ 664 et seq., 708, 711.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

9. **Criminal Law § 445 (NCI4th)— capital sentencing—prosecutor's jury argument—disapproval of taxpayers educating defendant—no gross impropriety**

Assuming impropriety in the prosecutor's argument in a capital sentencing proceeding expressing his disapproval of defend-

STATE v. GARNER

[340 N.C. 573 (1995)]

ant being educated at Shaw University at taxpayer expense while discussing the nonstatutory mitigating circumstance that defendant had sought to better himself educationally during his confinement, the argument was not so prejudicial to defendant's case as to amount to gross impropriety where the evidence in the case was overwhelming; defendant had already been convicted in one case where he assaulted a man with a pistol in an attempt to kill him and in another case where he killed and robbed a convenience store clerk; those two crimes were similar in nature, time, and motivation to the crime in this case; in this case, defendant slit the throat of a motel clerk, later shot and killed him, and also shot and killed a second motel clerk before robbing the motel; defendant bragged to two other people about his deeds; and the outcome of the sentencing proceeding was not changed as a result of the allegedly improper argument.

**Am Jur 2d, Trial §§ 678, 708, 711.**

**Counsel's reference in criminal case to wealth, poverty, or financial status of defendant or victim as ground for mistrial, new trial, or reversal. 36 ALR3d 839.**

**Prosecutor's appeal in criminal case to self-interest or prejudice of jurors as taxpayers as ground for reversal, new trial, or mistrial. 60 ALR4th 1063.**

**10. Criminal Law § 1360 (NCI4th)— capital sentencing— impaired capacity mitigating circumstance—insufficient evidence**

The evidence in a capital sentencing hearing was insufficient to support a finding of the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired where defendant's evidence of his voluntary intoxication came from witnesses who testified that defendant showed up at Army formations with alcohol on his breath, that defendant drank beer with an Army buddy regularly, and that he had failed a random drug test, and defendant's evidence of mental disorder consisted of testimony from family and friends that he underwent a radical and abrupt character change in the month before the murders which was indicative of a "mental breakdown." N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Criminal Law §§ 598, 599.**

Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.

Effect of voluntary drug intoxication upon criminal responsibility. 73 ALR3d 98.

When intoxication deemed involuntary so as to constitute a defense to criminal charge. 73 ALR3d 195.

11. **Criminal Law § 1363 (NCI4th)— capital sentencing— accomplice not tried capitally—not mitigating circumstance**

The trial court did not err by failing to submit as a nonstatutory mitigating circumstance in a capital sentencing proceeding that defendant's accomplice had not been and may not be tried capitally.

Am Jur 2d, Criminal Law §§ 598, 785.

12. **Criminal Law § 482 (NCI4th)— conversation between witness and juror—adequacy of court's inquiry**

The trial court conducted an adequate inquiry into an alleged contact between a State's witness and a juror to meet its duty to ensure the impartiality of the jury where the prosecutor informed the court that a State's witness told him that he had begun a conversation with a juror during a lunch recess after he testified but ended it upon realizing that the person was a juror, the court called the jury into the courtroom and asked the jurors if any of them had been in contact with the witness after he testified, none responded, and the court resumed the trial.

Am Jur 2d, Trial §§ 1607, 1608.

Prejudicial effect, in civil case, of communications between witnesses and jurors. 52 ALR2d 182.

Prejudicial effect, in criminal case, of communications between witnesses and jurors. 9 ALR3d 1275.

13. **Criminal Law § 1349 (NCI4th)— capital sentencing—statutory mitigating circumstances—instructions—mitigating value**

The trial court did not permit the jury to determine whether statutory mitigating circumstances found by the jury had mitigating value where the court first instructed as to the statutory mitigating circumstances; the court told the jurors that if they found

a statutory mitigating circumstance to exist they should mark "yes" in the space provided but did not specifically instruct that statutory mitigating circumstances are deemed by law to have mitigating value; and the court then instructed on nonstatutory mitigating circumstances and told the jurors to mark "yes" in the space provided if one or more jurors believed defendant's evidence supporting such a circumstance and further believed that the circumstance had mitigating value. The instructions are in accord with the law and could not have caused a juror reasonably to understand the trial court's final instruction regarding nonstatutory circumstances to refer back to all of the mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**14. Criminal Law § 1363 (NCI4th)— capital sentencing— adjustment to prison life—mitigating value**

The trial court did not err by failing to instruct that if any juror found by a preponderance of the evidence that defendant had the ability to adjust to prison life, the juror must give that circumstance mitigating value.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**15. Criminal Law § 1351 (NCI4th)— mitigating circumstances—burden or proof—"satisfy you"**

The trial court's use of the words "satisfy you" to explain the burden of proof applicable to mitigating circumstances was not error.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**16. Jury § 114 (NCI4th)— capital sentencing—denial of individual jury voir dire**

The trial court did not err by denying defendant's motion for individual jury *voir dire* in a capital sentencing proceeding.

**Am Jur 2d, Jury §§ 194, 195, 198, 199.**

**17. Jury 226 (NCI4th)— capital sentencing—death qualification of jury—excusal without rehabilitation**

The trial court did not err by denying defendant the right to examine each juror challenged by the State during death qualification prior to his or her excusal and by excusing jurors that defendant was not permitted to question.

**Am Jur 2d, Jury §§ 199, 279.**

18. **Homicide § 135 (NCI4th); Indictment, Information, and Criminal Pleadings § 31 (NCI4th)— first-degree murder— short form indictment—misspelling of defendant's name**

The "short form" indictment in N.C.G.S. § 15-144 was sufficient to charge defendant with first-degree murder. Furthermore, the misspelling of defendant's name in the indictment was not fatal.

**Am Jur 2d, Homicide § 207.**

19. **Criminal Law § 1323 (NCI4th)— nonstatutory mitigating circumstances—finding of mitigating value**

The trial court did not err by failing to instruct in accord with defendant's request to prohibit jurors from rejecting nonstatutory mitigation evidence if they found that it had no mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 888.**

20. **Criminal Law § 1325 (NCI4th)— capital sentencing—mitigating circumstances—instructions—use of "may"**

The trial court did not err by instructing that each juror "may" consider any mitigating circumstance found in sentencing issue two when answering issues three and four.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 888.**

21. **Criminal Law § 1332 (NCI4th)— capital sentencing— requested instruction—verdict binding on court**

The trial court did not err by refusing to give defendant's requested instruction that the jury's verdict in a capital sentencing proceeding "bound" the trial court and was not merely a recommendation.

**Am Jur 2d, Trial §§ 1830 et seq.**

**Propriety of imposition of death sentence by state court following jury's recommendation of life imprisonment or lesser sentence. 8 ALR4th 1028.**

22. **Constitutional Law § 371 (NCI4th)— death penalty statute—constitutionality**

North Carolina's death penalty statute, N.C.G.S. § 15A-2000, is constitutional and not based upon subjective discretion or applied arbitrarily, capriciously, or pursuant to a pattern of discrimination based upon race, gender, or poverty.

**Am Jur 2d, Criminal Law §§ 625 et seq.**

**23. Criminal Law § 1373 (NCI4th)— death penalty not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where defendant pled guilty to two counts of first-degree murder; the jury found the aggravating circumstances that the murders were committed for pecuniary gain and were part of a course of conduct which included the commission of crimes of violence against another person; the evidence showed that defendant slit the throat of a motel clerk whom he later shot and killed, and that he also shot and killed a second motel clerk before robbing the motel; and defendant had previously been convicted of a murder and robbery and also of an assault with a deadly weapon with intent to kill inflicting serious injury and attempted armed robbery.

**Am Jur 2d, Criminal Law §§ 627, 628.**

Justice ORR did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Battle, J., on 3 September 1993 in the Superior Court, Robeson County. Heard in the Supreme Court 10 April 1995.

*Michael F. Easley, Attorney General, by Jeffrey P. Gray, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate ·Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

MITCHELL, Chief Justice.

Defendant, Daniel Thomas Garner, was indicted on 22 May 1989 in two separate bills of indictment for the 31 October 1988 first-degree murders of Timmy Oxendine and Roger Ray Strickland. On 23 August 1993, defendant pled guilty to both counts of first-degree murder. Immediately following the entry and acceptance of the guilty pleas, the trial court held a capital sentencing proceeding pursuant to

N.C.G.S. § 15A-2000. The jury recommended a sentence of death in both cases, and the trial court sentenced defendant accordingly.

The State's evidence at the proceeding tended to show that the killings of Oxendine and Strickland were the culmination of a twenty-four day crime spree during which the defendant committed assaults, robberies and murders in the Robeson and Cumberland County areas of North Carolina. At the capital sentencing proceeding, the State introduced evidence tending to show that Kendrick Page testified that he spent the evening of 31 October 1988 at a Halloween party. He left the party sometime after midnight with his cousin. The two of them went to Rowland, Robeson County, North Carolina, where they met another cousin. Rowland Police Officer Frank McCree spotted the three men and advised them to stay out of trouble. As the three cousins were walking past the Rowland Motel, one of them observed that a motel room door was open. He suggested to the others that perhaps the guest was leaving and would give them the key so they could use the room for the remainder of the night. The three men entered the room and saw a person lying on the floor, bleeding. The men left the room and called 911 for emergency assistance.

Officer McCree responded to the call. He discovered a male victim lying face down in one of the motel rooms. When Officer McCree turned the victim over, he discovered that the victim's neck had been cut. Officer McCree then went to the motel office to contact the manager where he discovered a second victim with a bullet wound to his head.

Rowland Chief of Police Daniel Bradshen participated in the investigation of the murders. During the course of his investigation, he discovered that $700.00 was missing from the motel cash register.

Special Agent April Sweatt of the State Bureau of Investigation examined the crime scene at the Rowland Motel on 1 November 1988. Special Agent Sweatt observed that the cash register drawer in the office was open and empty, with the exception of approximately $3.00 in loose change. The victim located in the office area was identified as Timmy Oxendine. He had a single bullet wound to the back of his head, and his wallet was lying beside him. A spent shell casing fired from a .25-caliber semiautomatic weapon was recovered from the office area. The victim discovered in the motel room was identified as Roger Strickland. He had a bullet wound to the back of his neck, and his throat had been cut. A spent .25-caliber shell casing was located in the motel room.

STATE v. GARNER

[340 N.C. 573 (1995)]

Dr. Robert Andrews, pathologist, testified that Timmy Oxendine died from a bullet wound to the head. He also testified that Roger Strickland had two potentially fatal wounds, the cut to his neck and throat and the bullet wound. The bullet wound was the probable cause of death. Dr. Andrews extracted bullet fragments from both victims. These bullet fragments from both victims were tested by the State Bureau of Investigation, and it was stipulated that they all had been fired from the .25 caliber pistol later seized from defendant.

William Jackson, a taxicab driver in Fayetteville, testified concerning other crimes defendant committed after the two murders giving rise to this appeal. Mr. Jackson testified that he was dispatched on 18 November 1988 to pick up a passenger at the Express Stop convenience store on Ramsey Street at approximately 10:00 a.m. Mr. Jackson identified defendant as his passenger. When Mr. Jackson arrived at the Express Stop, defendant was seated in a white car being driven by a blonde-haired woman. Defendant kissed the driver, left the white car, entered the cab, and directed Mr. Jackson to drive him to a location on Highway 401 north of Fayetteville. Mr. Jackson identified the woman who was with defendant as Sherry Faulkner. Defendant continued to direct Mr. Jackson to a location on a dirt road in a rural portion of the county where there was a path leading off the road. Defendant told Mr. Jackson that there was a house at the end of the path and asked Mr. Jackson to drop him off at the start of the path. Mr. Jackson did not see a house.

Defendant got out of the cab and began searching his pockets as if he were searching for his wallet. At this point, Mr. Jackson observed the white car being driven by defendant's girlfriend approaching. Mr. Jackson commented to defendant that his girlfriend must have his wallet. Defendant then took a pistol from his pocket and shot Mr. Jackson twice in the chest. Defendant paused and then shot Mr. Jackson once in the head. Mr. Jackson slumped over in the seat and pretended to be unconscious. Defendant's girlfriend pulled up beside the cab, and Mr. Jackson heard her talking with defendant. The engine in the cab was still running. Mr. Jackson sat up in the cab, put it in gear, and drove away as fast as he could. Defendant entered the passenger side of the white car, and the car began to chase Mr. Jackson's cab. Mr. Jackson eventually got away. He was hospitalized for his injuries for over a month; a .25-caliber projectile was recovered from his spleen, a second projectile was later removed in a separate surgical procedure, and a third projectile remains lodged in his neck.

Defendant was subsequently convicted of assault upon Mr. Jackson with a deadly weapon with intent to kill inflicting serious injury and attempted robbery with a dangerous weapon. He was sentenced to sixty years imprisonment.

Sergeant Jeffrey Stafford of the Fayetteville Police Department testified that he investigated another robbery and homicide which occurred at the BTO convenience store on 27 October 1988. The victim, Eva Harrelson, had been shot twice in the head with a .25-caliber weapon, and approximately $1,100 was missing from the store. Officer Stafford testified that defendant had been convicted of the crimes at the BTO convenience store and as a result was currently serving his sentence of life imprisonment plus twenty-five years. Officer Stafford also testified that Dana Adams had participated in the robbery and murder at the BTO convenience store and had split the proceeds with defendant. Ms. Adams had pled guilty to accessory after the fact to murder and received a seven-year sentence. Ms. Adams had also participated in the Rowland Motel murders which resulted in defendant's convictions leading to this appeal. Ms. Adams had held one of the victims at gunpoint during the robbery.

Officer Stafford further testified that Dana Adams was a topless dancer who also worked for an escort service. Dana Adams and Sherry Faulkner danced together and were close friends. Defendant met Ms. Adams and Ms. Faulkner at a topless bar that he visited while his wife was out of town in late September 1988. Prior to his association with Ms. Adams and Ms. Faulkner, defendant had no criminal record.

A State Bureau of Investigation firearms expert testified that the bullets and spent shell casings recovered in the Eva Harrelson convenience store murder case, the William Jackson assault case, and the Rowland Motel murders case all had been fired from defendant's .25-caliber Beretta pistol seized from the 1081 Glen Reilly Road residence.

James McCleod testified that he was incarcerated with defendant in the Cumberland County jail in November 1988; defendant confessed to him regarding the BTO convenience store robbery and murder and the Rowland Motel robbery and murders. Defendant told Mr. McCleod that Dana Adams and defendant needed money. Ms. Adams told defendant that someone sold drugs from the Rowland Motel and that there was over $10,000 in the motel safe. When defendant and Ms. Adams arrived at the motel to rob it, they found two

homosexuals coming out of one of the motel rooms putting on their clothes. Defendant robbed the two men and then took one to a room and cut his throat. Defendant forced the other man to lie down behind the counter in the office area. This victim begged for his life, but defendant shot this victim in the back of the head because he "didn't want to leave behind any evidence." Defendant also told Mr. McCleod about shooting the taxicab driver, William Jackson.

Brad Dickens, a friend of defendant's, testified that he had met defendant through Dana Adams and Sherry Faulkner. Mr. Dickens recognized the .25-caliber Beretta pistol that had been introduced into evidence as one that he had seen in defendant's possession. Defendant had told Mr. Dickens about the BTO convenience store robbery and murder and about the Rowland Motel murders. Defendant told Mr. Dickens that his girlfriend and he checked into the motel and then asked the clerk to come to the room, claiming that there was a problem with the electricity. When the clerk arrived, defendant cut his throat and then went to the office where he killed the other clerk and robbed the motel. Mr. Dickens testified that defendant kept a box cutter in his car.

Defendant also presented evidence during the capital sentencing proceeding. Defendant did not testify but offered evidence from family, friends, and Army officers to the effect that he underwent an abrupt and radical character change a month before committing the Rowland Motel murders. Defendant had been a nice young man who married his high school sweetheart, and his life had been normal until he met Sherry Faulkner and Dana Adams, the topless dancers. Defendant's subsequent conduct was indicative of a mental breakdown.

[1] By his first assignment of error, defendant contends that the trial court erred by denying his motion to exclude the death penalty from consideration. Prior to trial, defendant filed a motion to exclude the death penalty from consideration, alleging that the District Attorney selected cases for capital prosecution in Robeson County in an arbitrary manner in violation of defendant's constitutional rights. The trial court held a pretrial hearing after which it denied defendant's motion.

Defendant argues that the evidence at the hearing showed that the District Attorney, who chose to try defendant for his life, acted arbitrarily in deciding which first-degree murder cases to pursue capitally. Further, defendant argues that as a matter of law the North

STATE v. GARNER

[340 N.C. 573 (1995)]

Carolina death penalty statute is arbitrarily applied in Robeson County. Therefore, defendant's sentences of death were obtained in violation of his constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 19, 23, and 27 of the North Carolina Constitution.

Judge Battle made the following material findings of fact:

1. Mr. Richard Townsend, the elected District Attorney for this district, has held office since January 1, 1989. Since that date some one hundred and fifty-one persons have been charged in bills of indictment with the crime of first degree murder. Of these, some four have been tried capitally as of this date. Of course, a number of cases are still pending.

2. In the case of State versus John Edward Butler, 89 CRS 018633, the defendant was indicted for the crime of first degree murder. There was evidence in the case of the existence of one or more aggravating factors as set forth in G.S. 15A-2000. Notwithstanding this, the defendant was tried for first degree murder, but the case was not tried as a capital case. The District Attorney has testified at this hearing that this was an error on the part of the assistant district attorney who prosecuted the case. So far as the evidence before this Court shows, this is the only occasion this has happened.

3. In the case of State versus Billy Ogene Hammonds, 90 CRS 007880, the defendant was indicted for the crime of first degree murder. There was evidence of one or more aggravating factors as set forth in G.S. 15A-2000. Notwithstanding this, the State accepted a plea of guilty to the lesser included offense of second degree murder and the defendant received a life sentence.

4. In the case of State versus Jimmy Neal Oxendine, 89 CRS 001890, the defendant was indicted for the crime of first degree murder. There was evidence of one or more aggravating factors as listed in G.S. 15A-2000. Notwithstanding this, the defendant was allowed to plead guilty to the crime of second degree murder and received a sentence of life plus thirty years for the murder and a related offense.

5. In the case of State versus Darrell Devon McLean, 91 CRS 000861, the defendant was indicted for the crime of first degree murder. There was evidence of one or more aggravating circumstances as set forth in G.S. 15A-2000. Notwithstanding this, the

defendant was allowed to plead guilty to the crime of second degree murder and received a sentence of life plus ten years for the murder charge and a related offense.

6. In the companion cases of State versus Robert Lee Vandroff, 90 CRS 006812, and State versus Daniel A. Jones, 90 CRS 006813, the defendants were each indicted for the crime of first degree murder and there was evidence of one or more aggravating factors as set forth in G.S. 15A-2000. Notwithstanding this, the two defendants were allowed to plead guilty to the charge of second degree murder and each received a life sentence.

7. There have been other cases since January 1, 1989, in which defendants were charged with first degree murder and there was evidence of one or more aggravating factors in which the State has elected not to try the defendants capitally, but to accept a plea to a lesser offense than first degree murder.

8. The reason the State accepts a plea to second degree murder as opposed to first degree murder is because under the law of North Carolina the State is precluded from accepting a plea to first degree murder and not proceeding to try the defendant capitally where aggravating factors are present.

9. The decision as to whether to try a defendant capitally or whether to accept a plea to a lesser offense than first degree murder is made by the District Attorney. In making this decision, the District Attorney considers such factors as: (a) the relative strength or weakness of the State's case to obtain a conviction of first degree murder. Included in this would be the question of the strength of the State's case as to the identification of the defendant as the perpetrator of the crime; (b) the presence or absence of legal questions or problems that might cause the State difficulty in the trial of the case; (c) the wishes and desires of the relatives of the victim; (d) the District Attorney's opinion as to the relative likelihood of the State being able to obtain a death recommendation from a jury.

10. There is no evidence before the Court that the District Attorney in making these decisions is in any way influenced by the race, sex or national origin of the defendant or the victim.

11. In making his decision to proceed to try these cases as a capital trial, the District Attorney has been influenced by the fact that the defendant is charged with two murders in this county and

that the defendant has been convicted of a murder in Fayetteville arising out of the same episode.

These findings by the trial court are supported by the evidence presented at the hearing and are binding on appeal. *State v. Barnett*, 307 N.C. 608, 300 S.E.2d 340 (1983).

This Court has consistently recognized that a system of capital punishment is not rendered unconstitutional simply because the prosecutor is granted broad discretion. *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985); *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). The trial court properly noted that the only limitation on this discretion pertinent to this case is that the decision to prosecute capitally may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. *Bordenkircher v. Hayes*, 434 U.S. 357, 54 L. Ed. 2d 604, *reh'g denied*, 435 U.S. 918, 55 L. Ed. 2d 511 (1978); *Oyler v. Boles*, 368 U.S. 448, 7 L. Ed. 2d 446 (1962). Such arbitrary classifications include prosecution due to a defendant's decision to exercise his statutory or constitutional rights. *United States v. Goodwin*, 457 U.S. 368, 73 L. Ed. 2d 74 (1982).

In order for a selective enforcement claim to prevail, the defendant must show the prosecutorial system was motivated by a discriminatory purpose and had a discriminatory effect. *Wayte v. United States*, 470 U.S. 598, 84 L. Ed. 2d 547 (1985). Defendant here has not shown that the District Attorney had an improper motive in deciding what charges to proceed with or which first-degree murder cases to try capitally. We do recognize that the decision whether to try a first-degree murder case as a capital case is not a matter within the district attorney's discretion. *State v. Britt*, 320 N.C. 705, 360 S.E.2d 660 (1987); *accord State v. Case*, 330 N.C. 161, 410 S.E.2d 57 (1991) (defendant may not plead guilty to first-degree murder under an arrangement whereby the State agrees not to submit aggravating circumstances which could be supported by the evidence). The trial court found as a fact that the case of *State v. Butler* had been handled erroneously in this manner. However, the District Attorney testified at the hearing that this was an error on the part of the assistant district attorney who prosecuted the case, and the trial court found that this was the only occasion where this has happened. We conclude that this one, isolated incident did not render the prosecutorial system for

capital cases invalid as a whole. Further, defendant has not shown that the District Attorney acted in an arbitrary manner or that his selection of this case for capital prosecution was an unconstitutional exercise of power.

Contrary to defendant's assertion, the trial court did not conclude that the death penalty statute was arbitrarily applied in any constitutional sense in Robeson County. The trial court's conclusion was only that

> [t]he application of the North Carolina death penalty statute is arbitrary *in the sense that* two people with similar backgrounds who commit identical crimes can be treated differently, that is one can be tried for his life while the other can be allowed to plead to second degree murder or some other lesser offense based on the factors set forth above.

(Emphasis added). This Court has repeatedly held that North Carolina's death penalty statute, N.C.G.S. § 15A-2000 (Supp. 1994), is constitutional. *E.g., State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995); *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994). Therefore, we conclude that Judge Battle properly denied defendant's motion.

[2] By his next assignment of error, defendant contends that the trial court erred by failing to adequately question prospective jurors in order to determine whether they could follow the law despite their personal opposition to the death penalty prior to excusing them for cause. We do not agree.

The standard for determining whether a prospective juror may be excused for cause because of his views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). In its application of the constitutional standard enunciated in *Witt*, this Court has consistently held that where a prospective juror's answers clearly disclose that his views would impair his ability to act in accordance with his instructions and his oath, such juror is properly excused for cause. *See State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). In this case, a reading of the jury *voir dire* reveals that poten-

tial jurors who expressed personal opposition to the death penalty were clear and unequivocal in their opposition. Upon learning that a prospective juror had reservations about the death penalty, the trial court asked the juror whether there were any circumstances in which he or she could vote in favor of the death penalty. Each juror said "No." Therefore, we conclude that these prospective jurors were properly excused.

**[3]** Defendant also argues that the trial court's inadequate examination of jurors, prior to excusing them for cause on the basis of their expressed opposition to the death penalty, resulted in a racially imbalanced jury. We disagree. While defendant cites numerous cases for the broad desirable goal of eliminating racial discrimination from the jury selection process, he fails to cite a single case for his proposition that a jury which is racially disparate after death-qualification results in prejudice to defendant. Furthermore, defendant has shown neither that the jury in this case was racially disparate, nor that the jury composition prejudiced him. Therefore, we conclude that this assignment of error is without merit.

**[4]** By another assignment of error, defendant contends that the trial court erred by sustaining the State's objection to defendant's proper inquiry of a prospective juror concerning the length of time defendant would serve in prison if convicted. This Court has repeatedly held that the length of time that a person may serve if sentenced to life imprisonment is not a proper subject for consideration by a jury. *See State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994); *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162, *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 532 (1994); *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118. It was for this reason that the trial court sustained the State's objection and instructed the jury that "life means life." In addition, defendant has failed to show any prejudice due to the trial court's exclusion of this question. This Court has stated, "We will assume the jury followed the court's instruction and did not consider the possibility of parole in reaching its verdict." *State v. Lee*, 335 N.C. at 266, 439 S.E.2d at 558. This assignment of error is without merit.

**[5]** By another assignment of error, defendant contends that the trial court erred by denying his motion to suppress evidence seized during the course of an unconstitutional search of his personal property.

Defendant filed a pretrial motion to suppress evidence of a .25-caliber Beretta pistol and a set of car keys seized from his jacket,

which was located inside a residence at 1081 Glen Reilly Road in Fayetteville. Defendant argues that law enforcement officers conducted a warrantless search of his property on the basis of consent given by a third party who had no legal authority to give such consent to search defendant's personal belongings. Therefore, he contends that the search and seizure of his property was unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 20 of the North Carolina Constitution. We disagree.

After conducting a pretrial hearing on defendant's motion to suppress, the trial court made the following relevant findings of fact:

5. Detective Binder asked Angela Weems for permission to search the residence and told her that he was looking for a pistol that might be involved in a shooting. Angela Weems consented to the search of her residence and signed the consent to search form, which has been introduced in evidence in this hearing as State's Voir Dire Exhibit Number One.

6. Thereafter, Lieutenant Binder told the other officers there at the residence to go ahead with the search.

7. Deputy Ronnie Kelly had been placed in charge of the so called great room in the residence, and at that point, proceeded to search the residence to see if he could find the weapon that might have been involved in the shooting.

8. In the great room of the residence, Deputy Kelly observed a pile of clothes. The clothes appeared to be both mens' and womens' clothes and were just lying on the floor in a state of disarray. Deputy Kelly proceeded to pick up the items and to squeeze them to see if he could find any weapon. Upon picking up the jacket that has been introduced into evidence at this hearing as State's Voir Dire Exhibit Two and upon squeezing the jacket, Deputy Kelly felt what he believed to be a firearm. He notified Lieutenant Binder of this; and upon identification personnel subsequently arriving, a firearm was removed from the jacket and that is the twenty-five caliber Beretta that was introduced into evidence at this hearing as State's Voir Dire Exhibit Three. Car keys were also found in the jacket, and they have been received in evidence as State's Voir Dire Exhibit Four.

9. No one at any time asked the Defendant for permission to search anything. Deputy Kelly was not aware at the time he

located the coat lying in the pile of clothes whether the coat belonged to the Defendant or someone else. The coat did in fact belong to the Defendant.

We note these findings are supported by the evidence presented at the hearing and are thus binding on appeal. *State v. Barnett*, 307 N.C. 608, 300 S.E.2d 340. Based upon these findings, the trial court concluded as a matter of law that the search was conducted with valid consent. The trial court further concluded that defendant had no reasonable expectation of privacy in the jacket because it was found lying in a pile of clothes in the living room of Angela Weems' residence.

A search is not unreasonable if lawful consent to search is given. *Id.* A third party may give permission to search where the third party possesses " 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.' " *Id.* at 615-16, 300 S.E.2d at 344 (quoting *United States v. Matlock*, 415 U.S. 164, 171, 39 L. Ed. 2d 242, 250 (1974)). In this case, the trial court found that Angela Weems consented to the search of her residence and signed the consent to search form. Furthermore, defendant's jacket was lying in a pile of clothing on the living room floor of the residence, and Deputy Kelly did not know the jacket belonged to defendant when he discovered it there. These facts fully support the trial court's conclusion of law that the search was conducted with valid consent, and defendant had no reasonable expectation of privacy. This assignment of error is without merit.

**[6]** By another assignment of error, defendant contends that the trial court erred by failing to grant a mistrial after "the prosecutor made an utterly improper and incurably misleading argument which insinuated that there was no such thing as multiple or consecutive life sentences in North Carolina." In his closing argument, the prosecutor stated:

> MR. TOWNSEND [prosecutor]: Now, you know, ladies and gentlemen, we spent—when the lawyers were talking with you about the punishment in this case, you know, the lawyers spent a lot of time and they said, you know, something like this. You know, ladies and gentlemen, he is going to be punished either way. If you give him the death penalty, he'll be punished and if you give him life imprisonment, he's going to be punished for these two murders. But think about it, ladies and gentlemen. This defendant got a life sentence for the death or murder of Eva Harrelson. So he has got a life sentence, and the Judge told you that a life sen-

tence means a life sentence and that under the law is what it means.

MR. CAMPBELL [defense counsel]: Object.

MR. TOWNSEND: And his two lawyers have repeatedly mentioned to you—

THE COURT: Well, wait a minute. I am going to sustain that objection.

MR. TOWNSEND: Okay. But think about it, ladies and gentlemen. He has come in here and he is wanting you to give a life sentence for the killing of Timothy Strickland.

MR. CAMPBELL: Objection.

THE COURT: Overruled.

MR. TOWNSEND: Well, is that going to add one day's amount of time—

MR. CAMPBELL: Object.

THE COURT: Well, objection sustained as to that line of argument.

MR. TOWNSEND: Ladies and gentlemen, the only way that you can punish this defendant for these two murders is to give him the death penalty because otherwise he is not going to get an additional day of time.

MR. CAMPBELL: Object and move to strike.

THE COURT: The objection is sustained and disregard that comment of the attorney, members of the jury.

Defendant contends that although the trial court sustained his objection to this argument, affidavits from jurors showed that the prosecutor's remarks had a significant influence on the jury's verdict, and the only cure for the misconduct was a mistrial.

This Court has held that where the trial court immediately sustains the defendant's objection to a prosecutor's comment and instructs the jury to disregard the offending remark, the impropriety is cured. See State v. Maynor, 331 N.C. 695, 417 S.E.2d 453 (1992); State v. Small, 328 N.C. 175, 400 S.E.2d 413 (1991). In this case, the trial court promptly sustained defendant's objection and allowed his motion to strike. The trial court then instructed the jury to "disregard

that comment" of the prosecutor. The trial court's actions therefore cured any possible error created by the prosecutor's argument. For this reason, we conclude that the trial court did not err in failing to grant a mistrial.

**[7]** By another assignment of error, defendant contends that the trial court erred by failing to give the following requested limiting instruction on the meaning of the phrase "course of conduct" as used in the aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(11):

> [A] murder is part of such a course of conduct if it and the other crimes of violence are part of a pattern of the same or similar acts which establish that there existed in the mind of the defendant a plan, scheme, system or design involving both the murder and those other crimes of violence.

This language is taken almost verbatim from *State v. Lee*, 335 N.C. at 277, 439 S.E.2d at 564. Instead, the trial court gave the following pattern jury instruction on the course of conduct aggravating circumstance:

> A murder is part of such a course of conduct if you find from the evidence beyond a reasonable doubt that in addition to killing the victim in the particular case under consideration, the defendant on or about the alleged date was engaged in a course of conduct which involved the commission of another crime or crimes of violence against another person or persons and that these other crimes were included in the same course of conduct in which the killing of the victim was also a part.

It is well established that when a defendant requests an instruction which is supported by the evidence and is a correct statement of the law, the trial court must give the instruction, at least in substance. *State v. Farmer*, 333 N.C. 172, 424 S.E.2d 120 (1993); *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600 (1988); *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). However, the trial court is not required to give the instruction in the exact language of the request. *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied*, —— U.S. ——, 123 L. Ed. 2d 503 (1993).

Defendant concedes that the jury would have likely found as an aggravating circumstance that defendant engaged in a course of conduct which included his commission of violent crimes against another

even if the requested instruction had been given, because this case involved two murders at the Rowland Motel. However, he argues that the trial court's instruction was overly broad in that it allowed the jurors to find the course of conduct aggravating circumstance based on two other unrelated crimes, of which defendant had already been convicted, thereby giving undue weight to this aggravating circumstance. We disagree.

In determining whether to give a course of conduct instruction, the trial court must consider several factors, among them " 'the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons.' " *State v. Lee,* 335 N.C. at 277, 439 S.E.2d at 564 (quoting *State v. Price,* 326 N.C. 56, 81, 388 S.E.2d 84, 98, *sentence vacated on other grounds,* 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand,* 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated on other grounds,* —— U.S. ——, 122 L. Ed. 2d 113, *on remand,* 334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated on other grounds,* —— U.S. ——, 129 L. Ed. 2d 888, *on remand,* 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied,* —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3818 (1995)). Here, each of the crimes occurred within a short period of time. The State's evidence tended to show that four days before the double murder at issue in this case, defendant robbed the BTO convenience store and killed the clerk. The State's evidence further tended to show that less than three weeks after the Rowland Motel shootings, defendant shot a taxicab driver. There was a span of only twenty-two days from the murder of the clerk and robbery at the BTO convenience store on 27 October to the shooting of the taxicab driver on the morning of 18 November. The time frame was sufficiently close to support the submission of this aggravating circumstance. Further, the *modus operandi* was similar in that evidence tended to show that defendant used the same pistol to kill, or attempt to kill, each victim and had one or two accomplices with him during each crime. Finally, the evidence of motivation was strong. Numerous witnesses testified that these acts were robberies for the purpose of obtaining money to buy drugs.

Therefore, we find that the convenience store robbery and murder and the assault on the taxicab driver were sufficiently connected to the instant crimes to support the particular instruction given by the trial court on the course of conduct aggravating circumstance. This assignment of error is without merit.

By his next assignment of error, defendant contends that the trial court erred by failing to intervene to correct grossly improper conduct by the prosecutor during closing arguments.

[8] Defendant first argues that he is entitled to a new sentencing hearing because the prosecutor repeatedly and explicitly asked the jurors to place themselves in the position of the victims:

> [H]ow would you like or how would you feel if on October 31, 1988, Daniel Garner went to wherever you were at on that day and told you, Mr. or Ms. Juror, you're going to die today? I have personally decided that you're going to die today. How would it make you feel, ladies and gentlemen? Think about it. I have decided that you're going to die because I'm going to take whatever little bit of money you have.
>
> . . . .
>
> . . . How much money do you have in your wallet or in your pocket or in your purse? Think about it. That's the price of your life to Daniel Garner.
>
> . . . .
>
> And think about it too, ladies and gentlemen when the lawyers get up here that if it was your [sic] death of your family member or your friend, if he would get up here and try and mitigate the premeditated killing of one of your loved ones by putting it off on anybody and everybody or anything in the world that they can think of.

The prosecutor later continued in the same manner, arguing that one of the victims "could have easily been one of your family members, of your friends or even you."

In support of his position, defendant cites *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994). In *McCollum*, this Court stated that an argument " 'asking the jurors· to put themselves in place of the victims will not be condoned.' " *Id.* at 224, 433 S.E.2d at 152 (quoting *United States v. Pichnarcik*, 427 F.2d 1290, 1291 (9th Cir. 1970)). The prosecutor in *McCollum* repeatedly asked the jurors to imagine the victim as their own child. Based on the evidence in that case, however, we concluded that the prosecutor's statements did not deny defendant due process. In reaching that conclusion, we said:

STATE v. GARNER

[340 N.C. 573 (1995)]

The prosecutor's arguments here did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused such as the right to counsel or the right to remain silent. The trial court instructed the jurors that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. Moreover, the weight of the evidence against the defendant with respect to the two aggravating circumstances submitted to the jury was heavy . . . . All of these factors reduced the likelihood that the jury's decision was influenced by these portions of the prosecutor's closing argument.

*McCollum*, 334 N.C. at 224-25, 433 S.E.2d at 152-53.

Likewise, the prosecutor's arguments here did not manipulate or misstate the evidence. The arguments did not implicate specific constitutional rights of defendant, such as the right to counsel or the right to remain silent. The trial court also instructed the jurors that the arguments of counsel were not evidence and that their decision was to be made on the basis of the evidence alone. Furthermore, the weight of the evidence against defendant was overwhelming as to the aggravating circumstances. Several witnesses testified that the murders were committed for pecuniary gain, and the double murders in this case were committed just four days after defendant robbed a convenience store and killed the clerk and less than three weeks before he assaulted a taxicab driver, indicating a course of conduct. Therefore, the prosecutor's arguments did not prejudice defendant and, thus, did not deny him due process.

Further, defendant failed to object to the prosecutor's arguments. Therefore, our review on appeal is limited to the question of whether the arguments of the prosecutor were so grossly improper as to require the trial court to intervene *ex mero motu. Id.* at 225, 433 S.E.2d at 153. Where, as here, it is apparent that the prosecutor's arguments did not deny defendant due process, we are compelled to conclude that those arguments were not so grossly improper as to require the trial court to intervene in the absence of an objection by defendant. *See State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979) (appellate courts ordinarily will not review the exercise of the trial judge's discretion in this regard unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations).

**[9]**  Defendant next argues that the prosecutor acted improperly by stepping well outside the record to express his own personal and highly prejudicial opinion that defendant was draining taxpayers' resources during his incarceration. In discussing the nonstatutory mitigating circumstance that defendant had sought to better himself educationally while in confinement, the prosecutor argued, without objection by defendant, that:

> [Y]ou know, this morning, ladies and gentlemen, I learned something that I didn't know. Shaw University, a good university, it's a private university; and as y'all know who have children, a private university is right expensive. But did you know until this morning, ladies and gentlemen, that all of us right here are paying for his education at Shaw through Shaw University?
>
> And I don't have [sic] anything wrong, ladies and gentlemen, with him taking trade classes to perhaps do something while he is in prison over there. But we are paying as taxpayers for his private education on that private college Shaw. I find that incredible, ladies and gentlemen, and it doesn't really sit well with me. I know there is [sic] plenty of deserving people out there on the streets of Robeson County that wouldn't have that same opportunity that Daniel Garner is getting through the citizens and taxpayers of this state. That's a real shame, ladies and gentlemen. That's the way I see it.

As a general rule, "[c]ounsel is afforded wide latitude in closing argument to the jury at sentencing and may argue the law and facts in evidence and all reasonable inferences drawn therefrom." *State v. Payne*, 337 N.C. 505, 525, 448 S.E.2d 93, 105 (1994) (citing *State v. Artis*, 325 N.C. 278, 323, 384 S.E.2d 470, 496 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991)), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995). Assuming *arguendo* that the prosecutor's argument was improper, however, defendant has failed to show how the prosecutor's argument was so prejudicial to his case as to amount to "gross impropriety." The evidence in this case was overwhelming. Defendant had already been convicted in one case where he assaulted a man with a pistol in an attempt to kill him and in another case where he killed and robbed a convenience store clerk. These two crimes were similar in nature, time, and motivation to the crime in this case. Here, defendant slit the throat of a motel clerk, then later shot and killed him. He also shot and killed a second motel clerk

before robbing the motel. Finally, he bragged to two other people about his deeds. We cannot say that the outcome of the sentencing proceeding was changed as a result of any of the allegedly improper arguments of the prosecutor. Accordingly, those arguments were not "grossly improper." This assignment of error is without merit.

[10] By another assignment of error, defendant contends that the trial court erred by failing to submit the mitigating circumstance that defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1994 Supp.). Defendant argues that there was substantial evidence from which a reasonable juror could have found this circumstance to exist. Evidence tended to show that in the month or so prior to the crime spree, defendant had acted substantially out of character. His family, friends, and Army officers testified to the effect that "he was not the same boy." Defendant's radical and abrupt character change together with evidence revealing a family history of mental illness, his substance abuse, his attraction to a cult, and indications that he was under a great deal of stress all supported the inference that defendant had suffered a mental breakdown in the month before the murders and that he did not appreciate the criminality of his conduct.

A trial court must submit any statutory mitigating circumstance supported by the evidence to the jury. N.C.G.S. § 15A-2000(b); *State v. Miller*, 339 N.C. 663, 455 S.E.2d 137 (1995). Defendant correctly notes that expert testimony is not necessary to establish the existence of the (f)(6) mitigating circumstance. *See State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118. "However, this circumstance has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected defendant's ability to understand and control his actions." *Id.* at 395, 428 S.E.2d at 142.

Defendant's evidence of his voluntary intoxication came from witnesses who testified that defendant showed up at Army formations with alcohol on his breath, that defendant drank beer with an Army buddy regularly, and that he had failed a random drug test. Defendant's evidence of a mental disorder consisted of testimony from family and friends that he underwent a radical and abrupt character change in the month before the murders which was indicative of a "mental breakdown." We conclude that this evidence, without

more, would not support a reasonable inference that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. This assignment of error is without merit.

[11] By another assignment of error, defendant contends that the trial court erred by failing to submit as a nonstatutory mitigating circumstance that defendant's accomplice, Dana Adams, had not been and may not be tried capitally. We disagree. This Court has held that the treatment of an accomplice by the criminal justice system is not a proper subject for consideration by a capital jury. *See State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983). This assignment of error is without merit.

[12] By another assignment of error, defendant contends that the trial court erred by failing to conduct an adequate inquiry into an improper contact between a juror and State's witness William Jackson. William Jackson, the taxicab driver who had been shot by defendant, testified on Thursday, 26 August 1993. At the opening of court on Monday, 30 August 1993, the prosecutor informed the trial court that he had spoken with Mr. Jackson. Mr. Jackson told the prosecutor that he had encountered a juror during the lunch recess on Thursday and begun a conversation. Upon realizing that the person was a juror, Mr. Jackson ended the conversation. Mr. Jackson was not in the courtroom when the prosecutor relayed this information to the trial court. Defense counsel requested that the trial court identify the juror with whom Mr. Jackson had conversed and then conduct an inquiry of that juror.

The trial court called the jury into the courtroom and made the following inquiry:

> THE COURT: Members of the jury, you remember last Thursday one of the witnesses was a Mr. William Jackson who was the taxicab driver?
>
> MR. SMITH [juror]: Yes, sir.
>
> (Jurors nodding their heads.)
>
> THE COURT: There has been some question raised about possibly one member of the jury might have run into Mr. Jackson accidentally or something at lunch last Thursday after he testi-

fied. Any one of you remember running into Mr. Jackson at lunch or anywhere outside the courtroom?

(No response from the jurors.)

THE COURT: All right. You may proceed.

Defendant contends that the trial court's response was insufficient to meet its statutory and constitutional duty to regulate the jury and ensure the jury's impartiality throughout the trial. We disagree.

"In the event of some contact with a juror, it is the duty of the trial judge to determine whether such contact resulted in substantial and irreparable prejudice to the defendant." *State v. Willis*, 332 N.C. 151, 173, 420 S.E.2d 158, 168 (1992). The scope of the inquiry is within the trial judge's discretion. *State v. Harrington*, 335 N.C. 105, 436 S.E.2d 235 (1993). The trial court in the present case asked the jurors if any of them had been in contact with Mr. Jackson after he had testified. None responded. With no response from the jurors, the trial court could do little more without running the risk of itself interfering with the jury's proper functioning. Under these circumstances, the trial court acted within its discretion. This assignment of error is without merit.

**[13]** By another assignment of error, defendant contends that the trial court erred by instructing the jury that it could determine whether any mitigating circumstance, either statutory or nonstatutory, had mitigating value. Statutory mitigating circumstances are deemed to have mitigating value and must be given some weight by the jury if found to exist. *State v. Mahaley*, 332 N.C. 583, 598, 423 S.E.2d 58, 67 (1992), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 649 (1995).

A review of the record shows that the trial court first instructed the jury as to the statutory mitigating circumstances: "It is your duty to consider the following mitigating circumstances and any others which you find from the evidence." The trial court described the statutory circumstances submitted and then instructed the jurors that "[i]f one or more of you find by a preponderance of the evidence that the circumstance exists, you would so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the form." After explaining how to address the three statutory mitigating circumstances, the trial court explained the nonstatutory mitigating circumstances, instructing: "Now, members of the jury, you should also consider the circumstances, listed as num-

bers 4 through 29 on the form, which you find arise from the evidence and which you find have mitigating value." The trial court then reviewed each of the twenty-six nonstatutory mitigating circumstances. The trial court differentiated between the statutory and nonstatutory circumstances by stating:

> In regards to these circumstances, that is numbers 4 through 29 [the nonstatutory mitigating circumstances], the defendant has offered evidence in support of each of them. This evidence is uncontradicted. Therefore, in regards to each of the circumstances listed as 4 through 29, if one or more of you believe the defendant's evidence and further believe that the circumstance has mitigating value, you would write yes by that circumstance.

Defendant argues that a juror reasonably could have understood the trial court's final instruction regarding nonstatutory circumstances to refer back to all of the mitigating circumstances which the trial court had dealt with in its instructions, both statutory and nonstatutory. Moreover, defendant contends that the fact that the trial court never explicitly told the jury that statutory mitigating circumstances are deemed by law to have mitigating value increased the likelihood that jurors interpreted the final instruction in an unconstitutional manner.

We have recently rejected this argument in *State v. Daniels*, 337 N.C. 243, 274-75, 446 S.E.2d 298, 318. In *Daniels*, the trial court instructed the jury as to the statutory mitigating circumstances before it gave its instructions as to the nonstatutory circumstances. We determined that the instructions were given in accord with the law and that the jury was able to follow the instructions as they were given. This Court reasoned:

> "We presume 'that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' " *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)) (alteration in original), *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993)).

*Id.* at 275, 446 S.E.2d at 318. Likewise, in this case, the instructions are in accord with the law, and we conclude that the jury was able to follow the instructions as they were given. This assignment of error is without merit.

**[14]** By another assignment of error, defendant contends that the trial court erred by failing to instruct that if any juror found by a preponderance of the evidence that defendant had the ability to adjust to prison life, the juror must give that nonstatutory circumstance mitigating value. Defendant argues that two of the submitted nonstatutory mitigating circumstances related to his ability to adjust to incarceration:

> (21) That the defendant has adjusted well to confinement.
>
> . . . .
>
> (29) That the defendant while incarcerated has in the past and can in the future effect [sic] the lives of others in a positive way.

Defendant contends that these circumstances were shown by uncontroverted evidence and thus should have been submitted as though they were statutory mitigating circumstances, so that the jury could not reject their mitigating value. We disagree.

The Supreme Court of the United States has held that an ability to adjust to prison life is a relevant mitigating circumstance. *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1 (1986). However, this Court has noted that in *Skipper* it was the fact that the defendant was precluded from introducing *evidence* concerning his ability to adjust to prison life that concerned the Supreme Court. *See State v. Basden*, 339 N.C. 288, 451 S.E.2d 238 (1994); *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995). In the present case, defendant was allowed to present evidence concerning his ability to adjust to prison life. The jury heard evidence that defendant participated in educational and religious programs while in jail. One jail minister testified that defendant had good relationships with his fellow inmates and that he relied on defendant to help control unruly participants in Bible study classes. In addition, the submission of the two mitigating circumstances listed above, as well as the catchall mitigating circumstance, allowed the jury to fully consider the evidence as presented by defendant. "*Skipper* does not require this Court to overrule its precedents holding that jurors are allowed to reject any nonstatutory mitigating circumstance which they do not deem to have mitigating value." *State v. Basden*, 339 N.C. at 304, 451 S.E.2d at 247. This assignment of error is without merit.

**[15]** Defendant, in other assignments of error, raises eight additional issues which he concedes have been decided against him by this

Court. First, defendant contends that the trial court's use of the words "satisfy you" to explain the burden of proof applicable to mitigating circumstances was reversible error. Defendant acknowledges that this issue was decided against him in *State v. Payne*, 337 N.C. 505, 448 S.E.2d 93.

[16] Second, defendant contends the trial court erred by denying his motion for individual jury *voir dire*. This Court held contrary to defendant's position in *State v. Soyars*, 332 N.C. 47, 418 S.E.2d 480 (1992), and *State v. Barts*, 316 N.C. 666, 343 S.E.2d 828 (1986). Defendant has shown nothing from the record in this case to justify a different result.

[17] Third, defendant contends the trial court erred by denying him the right to examine each juror challenged by the State during death qualification prior to his or her excusal and by excusing jurors that defendant was not permitted to question. Defendant acknowledges that this issue was decided against his position in *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993).

[18] Fourth, defendant contends the trial court erred by denying his motions to quash the murder indictments. Defendant was indicted using the "short form" indictment in N.C.G.S. § 15-144. This form of indictment has long been held valid. *See State v. Puckett*, 211 N.C. 66, 189 S.E. 183 (1937). In addition, defendant objects to the indictments on the ground that they misidentified defendant as "Daniel Thomas Gardner." The misspelling of defendant's name in the indictment is not fatal. *State v. Sawyer*, 233 N.C. 76, 62 S.E.2d 515 (1950).

[19] Fifth, defendant contends the trial court erred by failing to instruct in accord with his request to prohibit jurors from rejecting nonstatutory mitigation evidence if they found that it had no mitigating value. This Court has held to the contrary in *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298, and *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765.

[20] Sixth, defendant contends the trial court erred by instructing that each juror "may" consider any mitigating circumstance found in sentencing issue two when answering issues three and four. Defendant argues that this instruction made consideration of established mitigation discretionary with the capital sentencing jurors. We have recently addressed and rejected this argument. *State v. Basden*, 339 N.C. 288, 451 S.E.2d 238; *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252.

**[21]** Seventh, defendant contends the trial court erred by refusing to give his requested instruction that the jury's verdict "bound" the trial court and was not merely a recommendation. Defendant argues that this diminished the jury's sense of responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985). This Court has consistently upheld the pattern jury instruction—that it would be the jury's duty to recommend a sentence of death if the jury found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty—as constitutional. *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252; *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

**[22]** Finally, defendant contends that the North Carolina death penalty statute is unconstitutional and that the death sentences in this case were imposed in an arbitrary and discriminatory manner. This Court has repeatedly held that North Carolina's death penalty statute, N.C.G.S. § 15A-2000, is constitutional and not based upon subjective discretion, applied arbitrarily, capriciously, or pursuant to a pattern of discrimination based upon race, gender, or poverty. *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298; *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118.

We have considered defendant's arguments on each of these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error.

**[23]** Having concluded that defendant's capital sentencing proceeding was free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have thoroughly examined the record, transcripts, and briefs in the present case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentences of death in this case were imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In conducting proportionality review, we must determine whether the sentences of death in the present case are "excessive or disproportionate to the penalty imposed in similar cases, considering

both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 354, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983); *accord* N.C.G.S. § 15A-2000(d)(2).

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503. The pool of available cases from which those roughly similar with regard to the crime and defendant may be drawn for comparison purposes has been defined as

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Williams*, 308 N.C. at 79, 301 S.E.2d at 355. We have recently clarified the composition of the proportionality pool, noting:

> Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.

*State v. Bacon*, 337 N.C. 66, 107, 446 S.E.2d 542, 564 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995). Simply, the pool includes only those cases found to be free of error in both the guilt-innocence and penalty phases of the trial.

In the present case, defendant pled guilty to two counts of first-degree murder, and the jury recommended a sentence of death for each murder. As to each of the murders, the jury found as aggravating circumstances: (1) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), and (2) that the murder was part of a course of conduct which included the commission of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). The jury also found the following mitigating circumstances: (1) that prior to 1 October 1988, defendant had no significant history of prior criminal activity; (2) that defendant had demonstrated since his early teens that he was a hard-working person; (3) that prior to 4 October 1988, defendant had an exemplary and outstanding military record; (4) that defendant was, prior to October of 1988, a good mechanic in the military and was an outstanding example for other soldiers; (5) that defendant, but for this criminal conduct, has always been respectful to others; (6) that sickness and death of defendant's mother between his ages of nine and eleven was a devastating event in his life; (7) that defendant was abandoned by his father at birth; (8) that defendant was a good son; (9) that defendant was a good husband; (10) that defendant had adjusted well to confinement; (11) that defendant had sought to better himself educationally while in confinement; (12) that defendant had sought and continued to seek spiritual guidance; (13) that defendant while in confinement assisted the jail ministry with fellow prisoners; (14) that defendant had successfully completed a course of Christian study; and (15) the catchall mitigating circumstance of any other circumstance or circumstances arising from the evidence which one or more of the jurors deemed to have mitigating value.

In our proportionality review, we must compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162. We do not find this case similar to any of the cases in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment; each of those cases is distinguishable from the present case.

In *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988), the evidence tended to show that the defendant hid in the bushes at a bank and waited for the victim to make a night deposit. When the victim arrived, the defendant demanded the money bag. When the victim hesitated, the defendant fired a shotgun, striking him in both legs. The victim later died of cardiac arrest caused by the loss of blood from the shotgun wounds. The jury found only the aggravating circumstance of murder for pecuniary gain. *Benson* is easily distinguishable from the present case. Here, in addition to the pecuniary gain aggravating circumstance, the jury also found the aggravating circumstance that the murder was part of a course of conduct which included the commission of crimes of violence against another person. Further, defendant in the present case committed two murders rather than a single murder such as that committed by the defendant in *Benson.*

In *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant and several others planned to rob the victim's place of business. During the robbery, one of the assailants beat the victim to death. *Stokes* is also easily distinguishable from the present case because the jury found only one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel. In the present case, the jury found two aggravating circumstances. More importantly, defendant in the present case, unlike the defendant in *Stokes,* killed two victims rather than one.

In *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988), the only aggravating circumstance found by the jury was that the murder for which the defendant was convicted was part of a course of conduct which included the commission of other crimes of violence against another person. In the present case, the jury found that aggravating circumstance and that the murder was committed for pecuniary gain. Also, defendant in the present case murdered two victims, while the defendant in *Rogers* killed only one.

In *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant and two companions went to the victim's home intending to rob and murder him. After gaining entry into the victim's home, the men killed him and stole his money. The jury found as aggravating circumstances that the murder was committed during the commission of a robbery or burglary and that it was committed for pecuniary gain. In concluding that the death penalty was disproportionate in *Young,*

this Court focused on the failure of the jury to find either the aggra-
vating circumstance that the murder was especially heinous, atro-
cious, or cruel or the aggravating circumstance that the murder was
committed as part of a course of conduct which included the com-
mission of violence against another person. The present case is easily
distinguishable from *Young* because, among other things, the jury
found as an aggravating circumstance that the murder was committed
as part of a course of conduct which included the commission of
crimes of violence against another person. Furthermore, defendant in
this case murdered two victims, unlike the defendant in *Young*.

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), the single
aggravating circumstance found by the jury was that the murder was
committed against a law enforcement officer engaged in the perform-
ance of his official duties. In the present case, the jury found two
entirely different aggravating circumstances. *Hill* is easily distin-
guishable from this case in which defendant used the same .25-caliber
pistol to shoot both of his victims, and he also slashed the throat of
one of his victims.

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983), the
defendant was on foot and waved down the victim as the victim
passed in his truck. Shortly thereafter, the victim's body was discov-
ered in the truck. He had been shot twice in the head, and his wallet
was gone. The single aggravating circumstance found was that the
murder was committed for pecuniary gain. *Jackson* is easily distin-
guishable from the present case in which the jury found the addi-
tional aggravating circumstance that the murder was part of a course
of conduct which included the commission of crimes of violence
against another person. Moreover, defendant murdered two victims
here, rather than one.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), the
evidence tended to show that the defendant and a group of friends
were riding in a car when the defendant taunted the victim by telling
him that he would shoot him and by questioning whether the victim
believed that the defendant would shoot him. The defendant shot the
victim but then immediately directed the driver to proceed to the
emergency room of the local hospital. In concluding that the death
penalty was disproportionate there, we focused on the defendant's
immediate attempt to obtain medical assistance for the victim and the
lack of any apparent motive for the killing. In contrast, the evidence
in the present case tended to show that defendant made no efforts to

assist any of his victims. Furthermore, defendant committed these murders for pecuniary gain.

In conclusion, we have never found the death penalty to be disproportionate for a convicted murderer of multiple victims. We have even said that the fact that defendant is a multiple killer is "[a] heavy factor to be weighed against the defendant." *State v. Laws*, 325 N.C. 81, 123, 381 S.E.2d 609, 634 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 57, *cert. denied*, 502 U.S. 876, 116 L. Ed. 2d 174, *reh'g denied*, 502 U.S. 1001, 116 L. Ed. 2d 648 (1991).

In performing our statutory duty of proportionality review, it is also appropriate for us to compare the case before us to other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503.

If, after making such comparison, we find that juries have consistently returned death sentences in factually similar cases, we will have a strong basis for concluding that the death sentence under review is not excessive or disproportionate. If juries have consistently returned life sentences in factually similar cases, however, we will have a strong basis for concluding that the death sentence in the case under review is disproportionate.

*McCollum*, 334 N.C. at 242, 433 S.E.2d at 163. However, the factors to be considered and their relevance during proportionality review in a given capital case "will be as numerous and as varied as the cases coming before us on appeal." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. Therefore, the fact that juries in the past "have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

This Court has observed that in a majority of robbery-murder cases in the proportionality pool, the jury has returned a verdict of life imprisonment. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517. However, the case at bar is significantly different from those cases. First, this was a double murder, in addition to the robbery. Second, defendant had previously been convicted of a murder and robbery, and also of an assault with a deadly weapon with intent to kill inflicting serious injury and attempted armed robbery.

STATE v. GARNER

[340 N.C. 573 (1995)]

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Here, we conclude that the present case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

In *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985), we concluded that the death sentence was not disproportionate where the jury found the same two aggravating circumstances as in the present case: the murder was committed for pecuniary gain; and the murder was part of a course of conduct which included the commission of crimes of violence against another person. The defendant in *Gardner* also killed two people, but in a restaurant, not a motel. We have consistently stated that "this Court has never found disproportionality in a case in which the defendant was found guilty for the death of more than one victim." *State v. Price*, 326 N.C. at 96, 388 S.E.2d at 107. We conclude that *Gardner* is the case in our proportionality pool most similar to this case.

After comparing this case carefully with all others in the pool used for proportionality review, we conclude that it falls within the class of first-degree murders in which we have previously held that the death penalty was not disproportionate. Having considered and rejected all of defendant's assigned errors, we hold that defendant's capital sentencing proceeding was free of prejudicial error and that the resulting sentences of death were not disproportionate punishment. Therefore, the sentences of death entered against defendant must be and are left undisturbed.

NO ERROR.

Justice ORR did not participate in the consideration or decision of this case.